# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI

**MATTHEW KIRKE MCVAY,**

Plaintiff,

v.

**APPLIED MEDICAL TECHNOLOGY, INC.**

Defendant.

**Case No. 4:25-cv-00163**

**Judge Greg Kays**

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARYJUDGMENT

Matthew McVay was an excellent salesman for AMT. Yet AMT fired him, ostensibly because he violated hospital policy with his aggressive sales techniques. But the evidence does not support that basis for termination. To the contrary, AMT trained McVay to sell aggressively, even if it meant violating hospital policy. In fact, AMT encouraged violations of hospital policy, telling its employees that if they don't get banned from a hospital, they probably are not trying hard enough to sell  Instead, McVay's true "offense" was his sincerely held belief in the tenets of the Church of Jesus Christ of Latter-Day Saints, which set him apart from a workplace culture steeped in drinking and after-hours partying.

Simply put, McVay's faith was a sticking point for his company. Employees were uncomfortable with the fact that McVay did not drink alcohol, and they mocked his religion. They pushed him to drink alcohol and promised to "get the Mormon out of him." When McVay was banned from a hospital for his aggressive sales techniques, management did not stand by him as it had promised and as it had done for others. Instead, it terminated him, not because of

19466598-2

his conduct at work, but because his sincerely held beliefs and his adherence to those beliefs singled him out as someone who did not fit in with office culture.

As set forth below, there are multiple genuine issues of material facts that require a jury's input. Summary judgment is inappropriate.

**Plaintiff's Response to Defendant's Statement of Uncontroverted Material Facts**

**a. Plaintiff's Employment with AMT**

1. On November 1, 2022, Plaintiff began working for AMT as an Enteral Product Specialist. (Exhibit 1, August 13, 2025 Deposition of Matthew Kirke McVay ("McVay Dep.") at 28:5 – 7, 30:19 – 23.)

**RESPONSE:** Uncontroverted.

2. During his employment, Plaintiff's supervisor was Brandon Loftus ("Loftus"). (Exhibit 2, October 24, 2025 Deposition of Brandon Loftus ("Loftus Dep.") at 8:19 – 21.) Like McVay, Loftus is a member of the Church of Jesus Christ of Latter-Day Saints ("LDS"). (Ex. 1, McVay Dep. at 91:10 – 14 and 48:12 – 22; See also Ex. 2, Loftus Dep. at 92:14 – 18.)

**RESPONSE:** Uncontroverted.

3. While employed at AMT, Plaintiff never lodged a complaint of discrimination to AMT Management. (Ex. 1, McVay Dep. at 145: 21 – 24.) (Ex. 13, Aff. of Tyler Tofil ("Tofil"), ¶ 7.)

**RESPONSE:** Disputed. As Defendant admits in paragraph 16 of its Statement of Uncontroverted Material Facts, McVay filed a complaint alleging religious discrimination on March 8, 2024.

**McVay's First Complaint and Subsequent Lifetime Ban From the Mercy Hospital System**

4. The Mercy Hospital System purchased certain products from AMT. McVay had two

2

Mercy Hospitals assigned in his territory. (Ex. 1, McVay Dep. at 75:1 – 3.) On September 13, 2023, Mercy employee, Tammy Edwards ("Edwards"), notified McVay, as a courtesy, that Mercy was switching from AMT's nasal bridle to a competitors product. (Exhibit 3, Deposition of Tammy Edwards ("Edwards Dep.") at 18:21 – 25, 19:1 – 25.)

**RESPONSE:** Uncontroverted that the Mercy Hospital System purchased products from AMT and that Tammy Edwards notified McVay that Mercy was switching from AMT's nasal bridle to a competitor's product. Disputed that McVay had only two Mercy hospitals in his territory. Bentley testified that there are 44 acute care facilities in the Mercy system. See Defendant's Statement of Fact 10 below and Exhibit 1, McVay Declaration, ¶¶ 5, 7.

5. On September 15, 2023, McVay sent an email to Mercy educators and supervisors wherein he told them about the product change and that Edwards was responsible for that change. (the "September 15, 2023 Email"). He also encouraged the email recipients to contact Edwards with any concerns or comments about the product change. His email included Edwards' name and contact information but the email was, notably, not sent to her. (Ex. 3, Edwards Dep. at 21:1 – 25.) The email is attached as Exhibit 41.

**RESPONSE:** Undisputed that McVay sent the identified email and that he communicated concerns about Mercy's switch to a competitor's product. Undisputed that McVay did not send the email to Edwards. Plaintiff disputes, though, the characterization that the email was "notably" not sent to Edwards. The word "notably" is improper argument *See Kirk v. Schaeffler Grp. USA, Inc.,* No. 3:13-CV-5032-DGK, 2016 WL 3892831, at *3 (W.D. Mo. July 13, 2016), *aff'd in part,* 887 F.3d 376 (8th Cir. 2018) ("It is axiomatic that a party's arguments must be presented in the "Argument" section of its briefing, not in the "Facts" ).

6. Edwards testified that the September 15, 2023 Email was an attempt to go over her head with respect to a decision that had already been made and caused confusion among Mercy employees. (Ex. 3, Edwards Dep. at 25:19 – 25.) Edwards further testified that she felt the September 15, 2023 Email "was an attack on my person… personally to me and to my reputation with the caregivers and clinical staff." (Id. at 26:11 – 17.) Because of this email, Edwards made the decision to block McVay's access to Mercy by blocking him in their vendor system, Vendormate. (Id. at 29:16 – 25.) Edwards considered this a very serious violation of protocol. (Id. at 32:22 – 24.)

**RESPONSE:** Uncontroverted that Edwards testified as quoted. Plaintiff objects to Edwards' testimony regarding McVay's motivations, as that testimony is speculative. Disputed that the email was an attack on any person, as on its face the email is a sales email that attacks no one and is critical of no one. Disputed that the email was a serious violation of protocol, as Defendant asserts no basis for such an assertion. Edwards, in fact, testified that the email did not violate any hospital policy. Edwards Deposition, Exhibit 3 to Defendant's Memorandum, p. 45:12-14.

7. McVay acknowledged the reason he received the ban from Mercy was because of the September 15, 2023 Email he had sent to her nurses regarding the hospital's decision to switch to a competitor's product. (Ex. 1, McVay Dep. at 73:20 – 23).

**RESPONSE:** Uncontroverted that McVay's September 15, 2023 email was the asserted reason for his ban from Mercy Hospital.

8. Neither Bentley nor Loftus agreed with McVay's approach in the September 15, 2023 Email. Indeed, Bentley characterized the September 15, 2023 Email as "jeopardizing the AMT brand with extreme effort." (Exhibit 5, Deposition of William Bentley ("Bentley Dep.") at

4

39:7 – 11.) Loftus testified he did not see the September 15, 2023 Email before McVay sent it. (Ex. 2, Loftus Dep. at 55:9 – 11.) Loftus further testified that he felt the September 15, 2023 Email "painted a huge target on her back, and if someone did that to me, I would be upset." (Id. at 56:19 – 21.)

**RESPONSE:** Disputed. Bentley trained McVay to violate hospital policies as part of an aggressive sales approach. McVay Declaration, ¶ 2; Exhibit 4, McVay training notes. Contrary to Loftus's testimony, he both saw and approved McVay's September 15, 2023 email before McVay sent it to Mercy. McVay Declaration, ¶ 3; Exhibit 14, Email exchange between Loftus and McVay, September 15, 2023.

9. While he was blocked from Mercy, McVay contacted a patient services representative at Mercy and told her one of the products Mercy was using was "unsafe" and that AMT had a superior product. (Ex. 3, Edwards Dep. at 33:3 – 11.) Edwards testified that she considered this to be a serious enough infraction and she decided to ban McVay from Mercy. (Id. at 36:12 – 20.)

**RESPONSE:** Disputed. The cited testimony does not connect any comments about safety with Edwards' decision to ban McVay.

10. Bentley testified that he has never had a sales rep receive a system-wide dismissal. (Ex. 5, Bentley Dep. at 39:15 – 21.) He further testified that there are 44 acute care facilities in the Mercy Health System and McVay was unable to sell to those facilities forever. (Id. at 39:24 – 25, 40:1 – 7.) Bentley stated he reviewed sales reports and that McVay's sales for Mercy were $400,000.00 and McVay's territory was about $1,200,000 to $1,300,000. (Id. at 46:9 – 11.) Loftus likewise testified that he had never seen anyone receive a lifetime ban from a hospital system. (Ex. 2, Loftus Dep. at 89:5 – 6.)

5

**RESPONSE:** Disputed. Other AMT sales persons have been suspended from hospitals, including permanently. In October 2017, AMT sales person Ashleigh Toguchi received a permanent ban from Johns Hopkins in Baltimore, Maryland. Exhibit 10. In addition, Bentley overstates the monetary implications of McVay's ban. Mercy Springfield, where McVay's ban originated, had determined not to sell AMT's product for reasons having nothing to do with McVay, and after the ban, McVay continued to sell to other hospitals in the Mercy system. The Mercy hospitals accounted for approximately $350,000 of $3 million in sales in McVay's territory. Exhibit 1, McVay Declaration, ¶ 5. AMT has cited no evidence indicating any decline in sales resulting from McVay's conduct at Mercy.

11. Despite McVay's egregious actions at Mercy, he failed to perceive the seriousness of his actions. Indeed, McVay testified that he did not know if he would have been banned "had the employee not been so disgruntled and emotionally angry when she discovered that Mr. Loftus was in the hospital without an appointment." (Ex. 1, McVay Dep. at 81:18 – 22.)

**RESPONSE:** Plaintiff objects to the characterizations of McVay's actions as "egregious" and "serious," as those characterizations constitute improper argument. *See Kirk,* 2016 WL 3892831, at *3. Uncontroverted that McVay testified as quoted. All statements in paragraph 11 are immaterial.

## McVay's Second Complaint and Second Lifetime Ban from the VA.

12. Bentley then testified that McVay was terminated due to a "catastrophic event that happened at the St. Louis VA." (Ex. 5, Bentley Dep. at p. 61:1 – 3.) Specifically, when McVay entered the VA, he approached Mary Insalaco ("Insalaco"), a dietitian, in her office and would not leave. (See id. at 61:5 – 12.) He then saw a competitor's device on her desk and became visibly upset over this. (Id. at 61:13 – 15.) McVay then went back to the ICU and security was called.

(Id.at 61:17 – 18.) On February 29, 2024, Insalaco then emailed Brandon Loftus and stated "Brandon: I have some concerns I would like to alert you to a serious concern I have with Matt McVey. He has arrived on campus unauthorized and has been making unauthorized visits to patient care areas without an employee escort. He was asking to take photographs of out feeding pumps and tubing. I am turning this into VA police for investigation." (the "February 29, 2024 Email"). The emails from the VA and Mercy banning McVay are attached as Exhibit 6.

**RESPONSE:** Plaintiff objects to Bentley's testimony presented here as hearsay. Bentley admits his account of events is "secondhand." Exhibit 4 to Defendant's Memorandum, p. 61:5-6. McVay did not refuse to leave, and security was not called. Exhibit 1, McVay Declaration, ¶ 10.

13.    After receipt of the February 29, 2024 Email, Bentley and Loftus made the decision to part ways with McVay. (See Ex. 2, Loftus Dep. at 85:1 – 5.) Bentley testified that AMT has a bona fide occupational requirement that its reps are allowed to be in hospitals. (Ex. 5, Bentley Dep. at 40:1 – 3; see also Ex. 13, Aff. of Tofil, ¶ 16.) Bentley also testified that if sales reps were not allowed in hospitals, they could not perform their jobs. (Ex. 5, Bentley Dep. at 40:3 – 5.) Bentley also testified "[a]t that point Brandon and I realized it was okay to give up on him, that he is what he is, we can't fix that part of Matt that is going to get himself in trouble, because he doesn't know when to stop, he can't read situations. As, as Brandon said, he's lacking in emotional intelligence." (Ex. 5, Bentley Dep. 62:5 – 11.) Additionally, Loftus testified "it was too much liability for us to continue forward with Matt." (Ex. 2, Loftus Dep. at 81:15 – 16.) Loftus further testified that "if you're going to pull your cell phone out on an ICU floor and take pictures, that's a problem for any anybody in a hospital so." (Id. at 81:18 – 20.)

7

**RESPONSE:** Uncontroverted that Bentley and Loftus testified as quoted. Disputed that McVay was not allowed in hospitals, including Mercy hospitals, or that his ban had any significant effect on company income. See Plaintiff's response to paragraph 10 above. Disputed that McVay took pictures "on an ICU floor," because it is misleading. McVay took pictures of materials in a supply closet with the permission of hospital personnel. Exhibit 1, McVay Declaration, ¶ 9,11.

**McVay's Resignation from AMT and Subsequent Complaints**

14. Bentley and Loftus told McVay that if he wanted to submit his resignation, rather than be terminated, they would honor his two weeks' notice. (Ex. 5, Bentley Dep. at 63:22 – 25; 64:1 – 3; Ex. 1, McVay Dep. at 85:10 – 22.) Loftus testified that allowing McVay to resign would allow "him to finish out the month" and that it "gave him a little bit of extra cash, so to speak, and to help support him and his family until he found new employment." (Ex. 2, Loftus Dep. at 82:5 – 9.)

**RESPONSE:** Disputed and immaterial. Loftus and Bentley asked for McVay's resignation on March 4, 2024. Loftus and Bentley said they would permit McVay to resign, which would end his employment in mid-March. McVay asked whether he could finish out the month, and Loftus said no. Exhibit 1, McVay Declaration, ¶ 20.

15. McVay submitted his resignation on March 4, 2024. His resignation is attached as Exhibit 7. McVay testified that Loftus told him it might look better for future employment if he resigned. (Ex. 1, McVay Dep. at 88:8 – 13.) McVay also stated Loftus did not mention anything about McVay's religious affiliation as a reason for asking for his resignation. (Id. at 90:13 – 16.)

**RESPONSE:** Uncontroverted, but immaterial.

16. On March 8, 2024, McVay retracted his resignation and, for the first time,

complained to AMT's human resources about alleged discrimination and harassment by his supervisors and coworkers, which allegedly occurred months, if not years, prior. McVay supplemented his complaints on March 10, 2024, and March 11, 2024 (collectively the "HR Complaint"). The HR Complaint is attached as Exhibit 8. McVay, notably, testified that he had not made any complaints until after he submitted his resignation. (Ex. A, McVay Dep. at 134:13 – 16.)

**RESPONSE:** Uncontroverted, but immaterial.

17. Specifically, McVay objected to comments allegedly made by Bentley at a sales meeting held over a year earlier in December 2022, when, according to McVay, Bentley purportedly mocked LDS missionaries and bragged about turning Loftus into a "bad Mormon" who consumes alcohol at company functions3. McVay, however, testified that at the time these alleged statements were made, it was made in an orientation session in front of other trainees, and McVay had not yet told Loftus or Bentley of his religious affiliation. (Ex. 1, McVay Dep. at 104:15 – 16; 107:2 – 16.) McVay then testified that he did not complain to anyone in management about these comments. (Id. at 108:9 – 13.) McVay also testified that Loftus made a disparaging comment about the Church, but he likewise failed to file a complaint to AMT. (Id. at 116:20 – 21.) McVay acknowledged that no other supervisors made hostile comments about the Church. (Id. at 110:20 – 21.) Likewise, McVay testified he did not make a complaint regarding comments made by James Moore and Shelby Greer. (Id. at 111:18 – 21; 121:11 – 18.) While McVay outlined these specific instances to support his claims, he testified he has no direct evidence or firsthand knowledge that his termination was based upon his religious affiliation. (Id. at 142:25 – 143:1 – 16.)

9

**RESPONSE:** Uncontroverted that McVay was offended by Bentley's mocking of church missionaries or saying he had made Loftus into a "bad Mormon." Immaterial that some comments regarding religion were before Bentley or Loftus knew McVay's religious affiliation. Immaterial that McVay did not complain about offensive religious remarks. Undisputed that McVay testified that Loftus made a disparaging comment about the Church, but disputed that McVay "failed" to file a complaint, as he did not attempt to file a complaint at the time. McVay disputes that he did not have "firsthand knowledge" that his termination was discriminatory, because he lived the events surrounding his termination and had firsthand knowledge of them all, including the disparaging attitudes Bentley and Loftus had expressed toward the Church. The remaining statements in paragraph 17 are immaterial.

18.     AMT has an Anti-Harassment Policy and Complaint Procedure in place and promptly and thoroughly investigates any reported allegations of discrimination and harassment. (Ex. 13, Aff. of Tofil, ¶ 3.) In accordance with this policy, AMT conducted an investigation into McVay's HR Complaint. (Ex. 5, Bentley Dep. at 64:10 – 25; Ex. 1, McVay Dep. at 135:18 – 22; see also Ex. 2, Loftus Dep. at 90:16 – 22; see also Ex. 13, Aff of Tofil. ¶ 11.) AMT's Anti Harassment Policy and Complaint Procedure is attached as Exhibit 9.

**RESPONSE:** Immaterial that AMT has an anti-harassment policy. Disputed that AMT conducted a full investigation of McVay's grievance, as some of the people McVay identified as having relevant knowledge were not interviewed. Exhibit 15, Statement of Reid Sealby at McVay 00370.

19.     As part of the investigation, AMT interviewed the individuals listed in the HR Complaint. (Ex. 13, Aff. of Tofil, ¶ 11.) During the investigation, AMT discovered that McVay made offensive and inappropriate comments in the group chat. (Ex. 13, Aff. of Tofil, ¶ 17.)

Specifically, McVay joked about dead children and stated "What's worse than a dumpster full of dead babies… one live one at the bottom… What's worse than that… he eats his way out." (Ex. 13, Aff. of Tofil, ¶ 17.) This text message is attached as Exhibit 10.

**RESPONSE:** Disputed that AMT conducted a complete investigation into McVay's grievance, as some of the individuals he identified were not interviewed. See Plaintiff's response to ¶ 19, above. Immaterial that McVay made comments or jokes in emails.

20. McVay also made a sexually suggestive comment to a coworker, suggesting that her husband "emptied the barrels" during her pregnancy. (Ex. 13, Aff. of Tofil, ¶ 17.) This text message is attached as Exhibit 11.

**RESPONSE:** Uncontroverted, but immaterial.

21. AMT's investigation into McVay's complaints revealed that he was not terminated for his religious affiliation, but because he received two lifetime bans from two of his clients, in violation of AMT policy. (Ex. 13, Aff. of Tofil, ¶ 19.) Ultimately, Picha made the decision to terminate McVay's employment. (Ex. 13, Aff. of Tofil, ¶ 20; see also Ex. 5, Bentley Dep. at 65:4 – 6.)

**RESPONSE:** Disputed. For all the reasons set forth in response to Defendant's Statement of Uncontroverted Material Facts, in Plaintiff's Statement of Additional Facts, and because of the facts and arguments asserted in this Memorandum, AMT terminated McVay because of his religious affiliation. Disputed that Picha alone made the determination to terminate McVay, as Bentley and Loftus made the initial determination that McVay should be separated. Defendant's Statement of Uncontroverted Material Facts, ¶ 13.

22. On April 3, 2023, McVay filed a Charge of Discrimination against Defendant wherein he alleged religious and disability discrimination (the "Charge"). The Charge is attached

as Exhibit 12.

**RESPONSE:** Uncontroverted.

**Plaintiff's Statement of Additional Disputed Material Facts**

1.      Plaintiff Matthew McVay worked as a medical device salesperson for Defendant AMT from November 2022 to March 2024. McVay Declaration, ¶ 1. One of the products McVay sold was known as a "bridle." *Id.*

**Training and Performance**

2.      Early in his tenure, McVay received training in sales methods from AMT.  The training encouraged hospital policy violations as a way of getting in front of people. McVay Declaration, ¶ 2. For example, AMT encouraged cold calling, even though most hospital policies did not allow it. AMT trainers told sales persons to sell the bridle product "with extreme effort," and they told them they would provide support if they get in trouble with hospitals. *Id.*; Exhibit 3, Strategic Priorities. AMT told sales persons, "if you're not getting kicked out of hospitals, then you're not trying hard enough." Exhibit 1, McVay Declaration, ¶ 2.; Exhibit 4, Position Notes, November 12, 2022. Exhibit 15, Statement of Reid Sealby at McVay 00368.

3.      AMT sales persons fostered a culture of casual noncompliance with hospital policies. In one text stream, a sales person commented that she had received an email from a supply chain employee at a hospital regarding an "unapproved meeting," with a request to call immediately. Exhibit . The commenter added, "it went right into my trash folder." *Id.* Another sales person commented, "I wonder what % of reps actually call her," and another  responded, "some where between 0 – 0.1?" *Id.*

4.      McVay performed well, and was one of the top sales persons in the company. Exhibit 5, Dashboard Report, December 29, 2023, showing McVay among the top five sales

persons out of 30; Exhibit 6, Email from Loftus to McVay, August 18, 2023 ("You are way ahead of the curve on product knowledge, and the grasp you have on the territory.").

**Mercy Hospital System**

5.      Plaintiff Matthew McVay sent his September 15, 2023 email to Mercy staff regarding Mercy's switch to a competitor's product. Exhibit 5. Tammy Edwards of Mercy Hospital, who later banned McVay from the hospital for sending the email, describes blocking McVay from the hospital in part because "he communicated behind my back." Defendant's Exhibit 4, p. 8 of 9.

6.      Tammy Edwards of Mercy Hospital in Springfield, Missouri compiled a number of emails from her staff regarding McVay's September 12, 2023 email. One staff member asked that he be contacted to "let him know who to contact at the hospital or if he need to speak with one of our doctors." Defendant's Exhibit 4, p. 4 of 9. Another suggested that McVay's email was "perhaps a sales tactic." *Id.*, p. 6 of 9.

7.      When Edwards banned McVay from the hospital, she also banned McVay's supervisor, Brandon Loftus, "due to his role in this situation." Defendant's Exhibit 4, p. 7 of 9.

8.      AMT trained its salespersons not to focus on all hospitals in their territory, but to focus instead on approximately five hospitals. Exhibit 17, Loftus Deposition, p. 26:19-27:11.The Mercy Hospital System had multiple hospitals in McVay's sales territory. Exhibit 17, Loftus Deposition excerpts, p. 46:20-22; Exhibit 1, McVay Declaration, ¶ 5. Even after the purported system-wide ban, McVay continued to enter Mercy hospitals and sell there. McVay had difficulty entering only one hospital that was purchasing products from AMT. Exhibit 1, McVay Dec., ¶ 7.

13

9. After Mercy banned McVay, Loftus encouraged McVay to continue to contact Mercy patient services representatives and communicate that AMT had a superior product. McVay Declaration, ¶ 6.

**The VA Hospital**

10. At the VA Hospital in St. Louis, McVay did not take pictures "on an ICU floor." Rather he took pictures of products in a supply closet, with the permission of hospital staff. McVay Declaration, ¶ 9.

11. McVay texted Loftus about this incident, saying, "the purpose of getting that picture was just to get the part number so I wasn't going back and forth between the nurse and the engineer answering questions." Exhibit 9. Loftus responded, "Yep, your good. I get it." *Id.* McVay added, "those tubes are kept in a locked cabinet inside a locked room, so it would have been physically impossible for me to access them without a willing escort." *Id.*

**Religious Discrimination**

12. McVay is a member of the Church of Jesus Christ of Latter-Day Saints. He experienced significant hostility to his religious affiliation during his employment at AMT. Exhibit 1, McVay Declaration, ¶ 12.

13. At a training in 2022, Bill Bentley made disparaging comments about Church missionaries and bragged about making Brandon Loftus a "bad Mormon" who drinks. Exhibit 12, Discrimination Complaint. Bentley also showed a video that derided and mocked members of the Church. Exhibit 16, Statement of Dillon Ayers at McVay 00307.

14. One of the tenets of the Church is that members should not drink alcohol. McVay does not drink alcohol, but was encouraged to drink on multiple occasions while employed at the AMT. Exhibit 1, McVay Declaration, ¶¶ 14-15 .

14

15. At company social gatherings, including sales meetings in 2023 and 2024, McVay was encouraged to drink by others, as witnessed by Bentley and Loftus. Exhibit 12, Discrimination Complaint; Exhibit 16, Statement of Dillon Ayers at McVay 00306.

16. Loftus, a member, or former member, of the Church, expressed to McVay resentment toward the Church. Exhibit 12, Discrimination Complaint.

17. During a sales meeting in 2023, AMT employee Shelby Greer commented to McVay "we will get the Mormon out of you." This comment was heard by Loftus, who did not intervene or comment on it. Exhibit 12, Discrimination Complaint.

18. In a group text chat during a basketball game between Brigham Young University and Iowa State University, one poster stated, "Jesus > Joseph Smith" and posted a picture of a shirt that said, "Jesus loves Iowa State." Another poster responded, "religious smack talk, I love it." Exhibit 13.

19. Loftus was on the text chat. He did nothing to stop it, and he commented that he hated BYU. Exhibit 12, Discrimination Complaint.

20. The pressure to drink, the disparagement of the Church, and the comments about the Church were offensive to McVay. Exhibit 1, McVay Declaration, ¶ 19.

**Termination**

21. On March 4, 2024, Bentley and Loftus asked McVay to resign. McVay asked whether he could finish out the month, and Loftus said no. McVay Declaration, ¶ 20.

22. Other AMT salespersons have experience hospital bans similar to what McVay experiences. For example, Ashleigh Toguchi received a permanent ban from Johns Hopkins Hospital in Baltimore for allegedly violating hospital policies. AMT attempted to end the ban.

15

Exhibit 10. AMT did not discipline Ms. Toguchi related to this event. Exhibit 2, Bentley Deposition, p.50:10-17.

23.     Sales person Reid Sealby received a ban from the University of Colorado Health System for allegedly violating hospital policies. Exhibit 11.  AMT did not discipline Mr. Sealby related to this event. Exhibit 2, Bentley deposition, p. 52:11-17.

<strong>Argument</strong>

**I.      Summary Judgment Standard: McDonnell-Douglas Analysis is not Required**

The summary judgment standard is well known. Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court must construe the evidence in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Factual issues regarding material issues will preclude summary judgment.

In the Eighth Circuit, courts in employment cases apply the burden-shifting paradigm of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). That is, the plaintiff first established a *prima facie* case of discrimination, and then the burden shifts to the defendant to assert a legitimate, nondiscriminatory reason for the adverse action. Once it does, the burden shifts back to the plaintiff to show that any alleged nondiscriminatory reasons are but pretext for unlawful discrimination.

*McDonnell Douglas*, however, has come under significant doubt and criticism by courts and scholars, including the Supreme Court. *E.g., Tynes v. Fla. Dep't of Juv. Justice*, 88 F.4th 939, 946 (11th Cir.  2023) ("[a] plaintiff who cannot satisfy this [*McDonnell Douglas*] framework may still be able to prove her case with . . . enough evidence for a reasonable factfinder to infer

16

intentional discrimination."). In *Brady v. Off. Of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008), Justice (then Judge) Kavanaugh described the *prima facie* case as "a largely unnecessary sideshow" that "spawn[s] enormous confusion and wast[es] litigant and judicial resources." The court stated,

> the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas.* Rather, in considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

*Id.*

Justices Thomas and Gorsuch have recognized that *McDonnell Douglas* is inconsistent with Rule 56 on summary judgment, which requires plaintiffs simply to "proffer [] enough evidence to allow a reasonable factfinder to decide the case in his favor." *Hittle v. City of Stockton, California*, 14 S.Ct. 759, 761-64 (2025) (Thomas, J., joined by Gorsuch, J. dissenting). And in *Ames v. Ohio Dept. of Youth Services,* 605 U.S. 303 (2025), in which the Court held that a judge-made rule could not be applied because it did not arise from the statute, Justice Thomas wrote a concurring opinion in which he skeptically analyzed *McDonnell Douglas* and appeared to suggest that the Court may consider a direct challenge to *McDonnell Douglas*. He explained, "A plaintiff could prevail even if the employer's stated reason was *part* of the reason for the employer's action. It follows that a plaintiff's inability to satisfy *McDonnell-Douglas*'s third step does not necessarily mean the plaintiff's claim should fail." 605 U.S. at 324. He concluded:

> litigants and lower courts are free to proceed without the *McDonnell Douglas* framework. This Court has never required anyone to use it. And, district courts are well equipped to resolve summary judgment motions without it. Every day—and in almost every context except the Title VII context—district courts across the country resolve summary judgment motions by applying the straightforward text of Rule 56. In my view, it might behoove courts and litigants to take that same approach in Title VII cases.

*Id.* at 326.

*McDonnell Douglas* analysis tends to focus on single reasons for adverse employment actions, but in *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 656 (2020), Justice Gorsuch made clear that there may be multiple "but for" causes for a termination. With respect to Title VII, the Court held that the but-for causation standard "means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff's [protected classification] was one but-for cause of that decision, that is enough to trigger the law." *Id.*

This Court should not treat *McDonnell Douglas* as sacrosanct. Instead, the Court should heed the statements of Justice Kavanaugh in *Brady*, Justice Thomas in *Ames*, and Justice Gorsuch in *Bostock* regarding the causation standard, rely on the language of the statute, and determine whether AMT terminated McVay because of his religion. That is, was McVay's religious affiliation one of the but-for causes for his termination? And more to the point here, could a reasonable juror decide that it was? As set forth below, a reasonable juror could.

**II.      AMT is not Entitled to Summary Judgment on Plaintiff's Religious Discrimination Claim.**

Because courts are still in the habit of applying the *McDonnell Douglas* burden shifting analysis, we address it here as well. Regardless of what analytical tool the Court use, *McDonnell Douglas* or the simple language of the statute and Rule 56 to determine whether a reasonable jury could conclude that illegal discrimination one the but-for causes of McVay's termination, it becomes clear that genuine issues of material fact exist, and that that should be decided by the jury.

### A. Plaintiff Can Establish a *Prima Facie* Case of Religious Discrimination.

A *prima facie* case of religious discrimination requires a showing that (1) the plaintiff suffered an adverse action; (2) the plaintiff's religion motivated the adverse action; and (3) the plaintiff was thereby damaged. *Shiffman v. Kansas City Royals Baseball Club, LLC*, 687 S.W.3d 443, 464 (Mo. App. 2024). The burden in establishing a *prima facie* case "is not onerous." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011); *see also Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Here, Plaintiff can show that he endured multiple instances of religious discrimination and that his staunchly held beliefs in the tenets of his faith made it clear that he did not fit in with the corporate culture at AMT, and AMT terminated Plaintiff. At the *prima facie* stage, that is enough.

Defendant offers several reasons why it believes McVay cannot make a *prima facie* showing, but none of them is availing. First, Defendant argues that it terminated Plaintiff because he received two bans from hospitals. This argument, though, does not concern the *prima facie* case, but rather whether Defendant can assert a legitimate, nondiscriminatory reason for terminating McVay.

Likewise, Defendant argues that Plaintiff cannot make a *prima facie* showing of discrimination because Plaintiff violated AMT policies. But Defendant does not identify any particular policy that it believes McVay violated. A vague assertion of such a violation, made for the first time in a motion for summary judgment, cannot be sufficient for summary judgment, and certainly cannot negate a *prima facie* showing of discrimination.

Finally, Defendant argues that Plaintiff cannot show comparators who were treated differently. But as set forth below in the pretext analysis, Plaintiff can do just that. In any event,

'the exacting analysis Defendant proposed regarding comparators is far more than is required to establish a *prima facie* case.

Plaintiff's burden at the prima facie stage is not significant. Plaintiff is a member of a protected class and clearly suffered an adverse action, and McVay has provided reasons why he believes his termination constituted unlawful religious discrimination. AMT may assert its defenses elsewhere, but McVay has established a *prima facie* case.

### B. Defendant's Offered Reason for Plaintiff's Termination Was Pretext for Unlawful Religious Discrimination.

There are numerous avenues to establish that a given reason for an adverse employment action was pretext for unlawful discrimination. Broadly, a plaintiff can establish pretext by showing either that a reason given for an adverse action is unworthy of belief or that a prohibited reason more likely motivated the action. *Torgerson v. City of Rochester*, 643 F.3d at 1047. More specifically, a plaintiff can establish pretext by showing, for example, that the employer did not follow its own procedures. *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1084 (8th Cir. 2013). Here, AMT taught its sales persons to violate hospital policies and told them they would back them up of they were called out. PSOF ¶¶ 2-3. Loftus, McVay's own supervisor, was banned at the same time McVay was. *Id.* ¶ 7. And while other salespersons were not disciplined after they received bans for doing as they had been taught (PSOF ¶¶ 26-27), McVay, the Church member who did not fit in, was fired.

False reasons offered for termination can also establish pretext. *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1122 (8th Cir. 2006) *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). While AMT says it terminated McVay because he was banned from the Mercy Hospital System, McVay continued to enter Mercy hospitals, at AMT's encouragement. Mercy Hospital in Springfield had already switched to a

competitor's product, and there were numerous other hospitals in McVay's territory he could focus on instead of Mercy. PSOF ¶¶ 7-9. AMT has not established any economic losses from McVay's ban.

Likewise, although the VA Hospital in St. Louis banned McVay, when McVay explained the circumstances to his supervisor Brandon Loftus, Loftus responded, "Yep, your good. I get it." PSOF ¶ 11. On these facts, a reasonable jury could conclude that the reason AMT offered for McVay's termination was false.

An employee can establish pretext by showing that other employees who were not members of his protected class were treated differently. *Ridout v. JBS USA, LLC*, 716 F.3d at 1086. Other salespersons who were not members of the Church, including Ashleigh Toguchi and Reid Sealby, received hospital bans, but unlike McVay, they received no discipline from AMT. PSOF ¶¶ 22, 23. While Defendant argues that McVay's bans were more severe than those of other employees, it has not shown that those bans had any significant impact on his or the company's sales.

Yet another way to show pretext is to show that the employee received favorable reviews that were inconsistent with the termination. *See Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 921 (8th Cir. 2000). In August 2023, Plaintiff's supervisor wrote, "You are way ahead of the curve on product knowledge, and the grasp you have on the territory." PSOF ¶ 4. And in December 2023, three months after Plaintiff's September 2023 email had caused consternation for Mercy's supply chain head, and shortly before AMT terminated McVay, he was among the top five salespersons in the company. *Id.*

Finally, pretext can be shown by discriminatory animus in the workplace. *Fast v. S. Union Co.,* 149 F.3d 885, 891 (8th Cir. 1998). As shown above, Plaintiff observed and was the

21

target of significant animosity toward the Church of Jesus Christ of Latter-Day Saints. Incidents of such animosity included comments, made by or in the presence of Plaintiff's supervisors, such as "we will get the Mormon out of you," negative comments about Church-affiliated Brigham Young University, casual disparaging comments in texts, such as "Jesus > Joseph Smith," and repeated pressure to violate the tenets of the Church. These incidents, each one of them offensive to McVay, could be seen by reasonable jurors as forming part of a workplace culture into which McVay did not fit, and as therefore motivating his termination.

These examples, each of them acting together, create a significant impression that McVay's religious affiliation and observance, rather than the ineffectual hospital bans, or even in conjunction with them, were "but for" causes for Plaintiff's termination. *See Bostock v. Clayton County, Georgia*, 590 U.S. at 656. Reasonable jurors could easily reach that conclusion. The Court should therefore deny Defendant's motion and allow the jury to make that choice.

### III. AMT is not Entitled to Summary Judgment on Plaintiff's Hostile Work Environment Claim.

Defendant insists that summary judgment is appropriate on Plaintiff's claims for hostile work environment. It minimizes Plaintiff's allegations, contending, essentially, that "a little bit" of discrimination is not that bad. (Defendant's brief at pp. 16-18). But Defendant's motion disregards record evidence creating a genuine dispute of material fact on hostile work environment. A jury could find that Plaintiff was subjected to persistent, religion-based ridicule and pressure to drink such that the conditions of his employment were altered.

#### A. Hostile Work Environment

#### 1. Governing standard and Defendant's framing

A hostile work environment exists where the workplace is permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of

employment, considering frequency, severity, humiliation, and interference with work. *See Kelleher v. Wal-Mart Stores, Inc.,* 817 F.3d 624, 635 (8th Cir. 2016). In general, the law requires the court to view the record in Plaintiff's favor and assess the totality of the circumstances, not isolated incidents in a vacuum. *See e.g., Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.,* 130 F.3rd 349, 355 (8th Cir. 1997).

Defendant asserts Plaintiff "admitted" the conduct was welcome, pointing to language in an HR complaint that he was "willing to overlook and forgive." (Def. Brief at p. 16). But that statement does not concede welcome harassment; it reflects endurance of ongoing hostility to keep his job. At a minimum, whether Plaintiff "accepted" the conduct under these circumstances is a jury issue.

**2.     Record evidence shows frequent, religion-based ridicule and pressure to drink.**

A reasonable jury could find pervasive hostility tied to Plaintiff's LDS faith. For instance, in a December 2022 training, Regional Manager Bill Bentley showed a video mocking the Church, he mocked LDS missionaries, and boasted he made a subordinate a "bad Mormon" who drinks. (PSOF at ¶ 13). And McVay endured repeated pressure to drink at company events. One of his coworkers even promised to "get the Mormon out" of him by getting him to consume alcohol. (PSOF at ¶¶ 14, 15, and 17). Group texts included "Jesus > Joseph Smith" and "religious smack talk, I love it," with Loftus on the chat and not intervening. (PSOF at ¶¶ 18-19). Significantly, Loftus and Bentley participated in the decision to terminate Plaintiff. (DSOF at ¶ 13). Taken together, these incidents occurred across 2022–2024, at trainings, national meetings, group chats, and work events—well beyond "isolated or sporadic" remarks. A jury could find frequency (recurring for more than a year), severity (expressly targeting Plaintiff's

core beliefs), humiliation (public settings; texts; meetings), and interference with work (pressure to violate religious tenets to "fit in").

**3.      Defendant's "few incidents" and "stray remarks" reframing fails**

In its effort to persuade the Court to award summary judgment, Defendant improperly narrows the evidence to four items, ignoring additional incidents, settings of the incidents, and the decisionmakers' participation. (Def. Brief at p. 17-18). But, as set forth above, the law does not permit analysis of these incidents in a vacuum. Instead, the Court must review the evidence with an eye towards the totality of the circumstances. Here, the totality includes the onboarding mockery of Church missionaries, the "bad Mormon" boast, repeated drinking pressure, the "get the Mormon out of you" statements, and the group chat disparagement. These comments were not remote in time or unrelated to Plaintiff's work—they were endemic to company culture and visible to management.

Defendant also argues Plaintiff's own occasional inappropriate jokes defeat his claim. (Defendant's brief at p. 18). But Defendant's argument is essentially a fact argument about comparative egregiousness and is wholly improper at the summary judgment level. Whatever jokes McVay made does not erase religion-based harassment or convert it into "welcome" conduct, particularly on these facts, where Plaintiff consistently abstained from drinking as an expression of faith and objected in HR once termination loomed. At a minimum, this argument is for the jury.

**4.      Causation to protected status**

The harassment was explicitly tied to McVay's beliefs in the Church – pressuring Plaintiff to drink despite the prohibition in his faith; statements to get the "Mormon out" of him;

24

and disparaging important figures in Church liturgy. A reasonable jury could find a causal nexus to Plaintiff's religion and the harassment he experienced.

### 5. Effect on terms and conditions

The culture required alcohol-centered bonding to "fit in," openly disparaged McVay's religious beliefs, and was perpetuated or tolerated by managers. A jury could conclude that such conditions altered the terms of employment, forcing McVay to choose between his faith and inclusion in the sales team culture.

For the foregoing reasons, summary judgment on the hostile work environment claim should be denied.

### IV. AMT is not Entitled to Summary Judgment on Plaintiff's Retaliation Claim.

Defendant seeks summary judgment on Plaintiff's retaliation claims, arguing that the decision to terminate preceded the protected action and that it had legitimate nondiscriminatory reasons for termination. (Def. Brief at pp. 19-21). But Defendant's argument fails to consider significant facts on which a jury could find retaliation.

### A. *Prima facie* case

Plaintiff has made a prima facie case of retaliation. He has shown 1) Protected activity: Plaintiff lodged a complaint with Human Resources asserting religious discrimination and harassment on March 8, 2024, and supplemented his complaint on March 10–11 (DSOF at ¶ 16); 2) Adverse action: Plaintiff was terminated following this complaint after Defendant rejected his retraction of resignation and proceeded to separation; and 3) Causation: the record shows factual disputes about the decision to terminate such that summary judgment is not appropriate. For instance, Bentley and Loftus offered resignation "in lieu of termination," but Plaintiff retracted his resignation on March 8 and made his complaint; AMT then investigated and proceeded to

terminate. A jury could find the ultimate decision to terminate, as opposed to allowing resignation or considering alternatives, was finalized after protected activity, with Picha as the formal decisionmaker post-investigation.

Further, Defendant's own narrative ties the sequence: request resignation (March 4) → HR complaint (March 8–11) → investigation ruling out any discriminatory → Picha moved forward with termination. Whether the termination was "because of" the complaint, in whole or part, is for the jury given this close temporal proximity and intervening decision process. *See e.g., Bergstrom-Ek v. Best Oil Co.,* 153 F.3d 851, 859-60 (8th Cir. 1998)(close proximity between protected action and adverse action sets up an inference of retaliatory motive).

Plaintiff disputes material aspects of the asserted bans and their impact, including the scope of the ban at Mercy, comparators with similar bans not terminated, and whether alleged VA conduct occurred as described. (PSOF at ¶ ¶ 7-11). Pretext/causation are jury issues. This record suffices to establish a prima facie case and a triable dispute on but-for causation.

### B. Pretext and shifting explanations

Defendant claims it has a "policy" requiring termination for hospital bans and that this was unprecedented. Plaintiff presents evidence of similarly situated AMT salespeople receiving hospital bans (e.g., permanent ban at Johns Hopkins; UC Health) who were not terminated, undermining any rigid policy and supporting pretext. (PSOF at ¶ ¶ 21-22). Defendant also inflates the scope and financial impact of the Mercy "system-wide" ban; Plaintiff offers contrary evidence that he continued to access and sell at Mercy facilities and that Mercy Springfield had already elected a competitor for reasons unrelated to him. (PSOF at ¶¶ 7-8). A jury could reject Defendant's asserted business-necessity rationale.

26

Further, Plaintiff adduces evidence that management trained and encouraged rule-bending, aggressive tactics—including "if you're not getting kicked out of hospitals, you're not trying hard enough"—and promised to smooth over policy violations. Punishing Plaintiff for conduct aligned with that training while tolerating similar or worse by others supports pretext and retaliatory motive post-complaint. *See e.g., Rimson v. Amazon Logistics, Inc.,* 652 F.Supp.3d 1048, 1060 (WDMO 2023*)(f*inding a genuine issue of material fact on pretext when Plaintiff presented evidence which would permit a jury to find that Defendant's explanation is unworthy of credence).

## Conclusion

McVay did not fit in with the corporate culture at AMT. He was good at his job, and his sales numbers reflected that. Being banned from hospitals based on behavior AMT encouraged would not have stopped McVay from continuing to be successful. But religion and corporate culture got in the way. That was at least one of the reasons Plaintiff was terminated. Defendant's motion for summary judgment should be denied.

Respectfully Submitted,

**DUGAN SCHLOZMAN LLC**

 /s/ *Mark V. Dugan*
Heather J. Schlozman, KS Bar # 23869
Mark V. Dugan, KS Bar # 23897
heather@duganschlozman.com
mark@duganschlozman.com
8826 Santa Fe Drive, Suite 307
Overland Park, Kansas 66212
Telephone:  (913) 322-3528
Facsimile:   (913) 904-0213

**Counsel for Plaintiff**

**CERTIFICATE OF SERVICE**

On December 12, 2025 I filed the foregoing through the Court's electronic filing system, which provides notice on all counsel of record.

*/s/ Mark V. Dugan*
**Counsel for Plaintiff**
